UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
ANTHONY ZAPPIN,

                           Plaintiff,                      Case No. 1:20-cv-05602-LGS

                - against -

                                                **FIRST AMENDED COMPLAINT**
J. RICHARD SUPPLE, JR.,
HINSHAW & CULBERTSON LLP,                  Jury Trial Demanded

                         Defendants.
------------------------------------------------------------ X

       Plaintiff Anthony Zappin ("Plaintiff") hereby brings this action against Defendants J. Richard Supple Jr. ("Supple") and Hinshaw & Culbertson LLP ("H&C") alleging the following:

**THE PARTIES**

      1.     Plaintiff Anthony Zappin is a citizen of the State of West Virginia.

      2.     Upon information and belief, Defendant J. Richard Supple. Jr. is a citizen of the State of New York and is domiciled in that state.  Supple was formerly a partner at the law firm Hinshaw & Culbertson LLP in the firm's New York, New York office.  Supple is now a partner at the law firm of Clyde & Co LLP and maintains a professional address of The Chrysler Building, 405 Lexington Avenue, New York, NY 10174.

      3.     Upon information and belief, Defendant Hinshaw & Culberston LLP is a limited liability partnership organized under the laws of the State of Illinois and maintains its principal place of business at 151 North Franklin Street, Suite 2500, Chicago, Illinois, 60606.  H&C maintains an office 800 3rd Avenue, 13th Floor, New York, NY 10022.  However, for the purposes of diversity jurisdiction, a limited liability partnership, such as H&C, "takes the citizenship of each of its members." *Bayerische Landesbank v Aladdin Capital Mgmt., LLC*, 692 F.3d 42, 49 (2d Cir.

2012).  Accordingly, upon information and belief, for the purposes of diversity jurisdiction H&C is domiciled in the following states and countries:

- Illinois

- Arizona

- California

- Florida

- Indiana

- Louisiana

- Massachusetts

- Minnesota

- Missouri

- Rhode Island

- Texas

- Wisconsin

- New York

- New Jersey

- Connecticut

- United Kingdom

Plaintiff came to this well-founded belief by collecting the names of each of the partners on the H&C website (http://www.hinshawlaw.com).  Plaintiff then used publicly available search tools to locate the home residence of each and every one of H&C's partners.  Based on Plaintiff's searches, H&C's partners are domiciled in the above-listed states.

4.      With respect to H&C's citizenship, it should be further noted that H&C has conceded that it is not a citizen or domiciled in West Virginia.  Specifically, in the *Zappin v. Supple et al.* action filed in the United States District Court for the Southern District of West Virginia, H&C stated that:  "Defendants [Supple and H&C] are certainly not 'at home' in West Virginia." *See Zappin v. Supple et al.*, Case No. 3:20-cv-00210 (S.D.W.Va. 2020) at Dkt. No. 11, p. 2 (Defendants' Memorandum in Support of Their Motion to Dismiss).[1]

5.      Based on the foregoing, there is complete diversity between the Plaintiff and the Defendants.  Diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) exists in this action.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff has a different citizenship (West Virginia) from each of Defendants (Defendant Supple: New York; Defendant H&C: Illinois, Arizona, California, Connecticut, Florida, Indiana, Louisiana, Massachusetts, Minnesota, Missouri, New Jersey, New York, Rhode Island, Texas, Wisconsin and the United Kingdom) in this action.  Additionally, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

---

[1] H&C went on to reaffirm that it had virtually no contacts with West Virginia, much less a partner domiciled in the mountain state.  Specifically, H&C stated:

> Defendants have very little, if any, connection to West Virginia … [H&C], while headquartered in Illinois, maintains law offices in the States of Arizona, California, Florida, Indiana, Louisiana, Massachusetts, Minnesota, Missouri, New York, Rhode Island, and Wisconsin, as well as in London, United Kingdom. Ex. 2.  It does not maintain an office in West Virginia.  *Id.*  Its attorney have only appeared in West Virginia courts *pro hac vice* in approximately five (5) matters in the last five (5) years.  *Id.* … **[H&C] has no ties to West Virginia.**

*See Zappin v. Supple et al.*, Case No. 3:20-cv-00210 (S.D.W.Va. 2020) at Dkt. No. 11, p. 3 (Defendants' Memorandum in Support of Their Motion to Dismiss) (emphasis added).

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims in this action occurred in this Judicial District.

## FACTUAL ALLEGATIONS

I.      Incorporation of *Zappin v. Hamilton, et al.* Complaint

8.      Plaintiff hereby incorporates the allegations set forth in the Complaint (Dkt. No. 1) filed in the matter *Zappin v. Hamilton, et al*, Case No. 3:20-cv-00209 pending in the United States District Court for the Southern District of West Virginia as if fully set forth in this Complaint.

II.     Incorporation of the *Zappin v. Dopico, et al.* Complaint

9.      Plaintiff hereby incorporates the allegations set forth in the First Amended Complaint (Dkt. No. 23) filed in the matter *Zappin v. Dopico, et al.*, Case No. 1:19-cv-10573 pending in this Court from Paragraphs 8 to 23.

III.    Plaintiff's Retention of Defendants in the New York Disciplinary Matter

10.     Days after Sarah Jo Hamilton asked to withdraw from representing Plaintiff in the New York disciplinary matter in September 2016, Plaintiff began searching for new counsel. Plaintiff spoke with several attorneys, many of whom were recommended by Ms. Hamilton, before retaining Defendants to represent him.  Although Defendant Supple was not recommended by Ms. Hamilton, Plaintiff reached out to him because it appeared that he had experience in collateral estoppel disciplinary proceedings.  Indeed, Plaintiff would later learn that Supple was in fact the pioneer of collateral estoppel disciplinary proceedings in the First Department having filed the first attorney discipline matter in that jurisdiction using collateral estoppel.

11.     Prior to Plaintiff formally retaining Defendants as his counsel, Plaintiff provided all the filings in the New York disciplinary matter up to that point in time to Defendant Supple.

4

Subsequently, Plaintiff and Defendant Supple spoke several times about the matter.  During these conversations, it appeared that Defendant Supple had thoroughly reviewed the filings and papers that Plaintiff had provided him prior to retaining him.

12.     Plaintiff decided to retain Defendants because Defendant Supple had what appeared to be a detailed defense strategy.  Specifically, Defendant Supple laid out four (4) things he intended to do if he was retained:

      i.    File a motion to clarify the First Department's September 19, 2016 order granting the First Department Attorney Grievance Committee's ("AGC") April 22, 2016 collateral estoppel petition;

     ii.    File a motion for reconsideration of the First Department's September 19, 2016 order granting the AGC's April 22, 2016 collateral estoppel petition;

   iii.    File a motion to stay the collateral estoppel proceeding pending the outcome of Plaintiff's appeal in the underlying matrimonial action; and

   iv.    Attempt to engage in settlement negotiations with the AGC in hopes of diffusing the animus the AGC and Staff Attorney Kevin Doyle held towards Plaintiff.

Based on the representations of Defendant Supple that he would undertake this defense strategy, Plaintiff retained Defendants to represent him in the New York collateral estoppel disciplinary matter.  However, as set forth below, after Plaintiff retained Defendants to represent him, Defendant Supple failed to follow through on any of the items laid out above.

IV.     Motion to Clarify the September 19, 2016 Order

13.     In the April 22, 2016 collateral estoppel petition filed by the AGC, Plaintiff was accused of engaging in no less than eight (8) acts of misconduct, which were all distinct.   In granting the AGC's petition, the First Department issued an order with effectively only one (1) sentence:

> Ordered that the petition is granted to the extent of finding that, and pursuant to the doctrine of collateral estoppel, respondent is guilty of professional misconduct in violation of RPC 8.4(c), RPC 8.4(d), RPC 8.4(h), RPC 3.1, RPC 3.3(a)(1), RPC 3.3(a)(3) and RPC 3.3(f)(2) of the Rules of Professional Conduct.

(*See* September 19, 2016 Order.)   The order was vague and devoid of any factual recitation, analysis or discussion as to the applicable law or application of the law to the facts.

14.     In Plaintiff's conversations with Defendant Supple, he stated that a motion to clarify was necessary for three (3) reasons:

i.      The September 19, 2016 Order failed to specify what conduct violated each enumerated rule in the order.  This was problematic because in the April 22, 2016 petition, the AGC alleged that multiple distinct acts violated the same rule.   Defendant Supple explained to Plaintiff that this was prejudicial because it was unclear what precise conduct actually was at issue and needed to be mitigated during the mitigation/aggravation phase of the proceeding;

ii.     The September 19, 2016 Order failed to provide any analysis as to why collateral estoppel was appropriate.  Specifically, the First Department had failed to explain how Plaintiff was afforded constitutionally sufficient notice and an opportunity to be heard in the underlying matrimonial action

sufficient to now find him guilty of professional misconduct without a hearing before the disciplinary authority; and

iii.     The September 19, 2016 Order failed to provide any discussion as to why collateral estoppel was appropriate with respect to whether the matrimonial findings relied on by the AGC were "material" and "essential" to the underlying matrimonial judgment sufficient to invoke collateral estoppel.

With respect to all three (3) issues, Defendant Supple stated and agreed that they raised serious constitutional questions and that Plaintiff's right to Due Process was infringed by the September 19, 2016 Order.

15.     Despite Defendant Supple appearing to realize the importance that a motion to clarify be filed, he failed to do so.  Despite representing to Plaintiff on several occasions that he was in the process of "thinking about it" and "preparing it," Defendant Supple never prepared anything.  Indeed, Defendant Supple completely blew the deadline to file.  In fact, as discussed below, Plaintiff believes that Defendant Supple never had any intention of filing a motion to clarify, despite his representations to Plaintiff that he intended to do so.

16.     Defendant Supple's failure to prepare and file a motion to clarify based on the above stated issues was materially negligent and prejudicial to Plaintiff in the New York disciplinary proceeding.

V.     Motion for Reconsideration of the September 19, 2016 Order

17.     In Plaintiff's conversations with Defendant Supple, he stated on several occasions that a motion for reconsideration of the September 19, 2016 Order needed to be filed.  Specifically, he repeatedly claimed that Ms. Hamilton had "fucked up" in her opposition papers to the April 22, 2016 collateral estoppel petition.  Defendant Supple stated that she:  (i) failed to properly raise the

constitutional issues involved in the case; (ii) failed to request compliance with the New York Rules for Attorney Disciplinary Matters, 22 NYCRR 1240 *et seq.*, which included bringing of formal charges, discovery and a hearing on the merits before the disciplinary authority; (iii) failed to adequately argue the issue of collateral estoppel, specifically the issue of whether the findings relied on by the AGC were "material and essential" to the underlying matrimonial judgment; and (iv) failed to raise and present evidence that Justice Cooper's findings relied on by the AGC were counter to the record, lacked any evidentiary support and were largely fabricated, which went directly to the issue of whether Plaintiff was afforded a full and fair opportunity to litigate in the matrimonial action.  Defendant Supple further critiqued Ms. Hamilton's efforts by saying that everything should have been laid out in a brief and not in an affirmation like she had submitted.

18.    Defendant Supple represented to Plaintiff that it was important to file a motion for reconsideration in order to:  (i) get the constitutional issues properly before the First Department; (ii) to lay out why collateral estoppel was not appropriate in the case, which Ms. Hamilton failed to do according to him; (iii) that the AGC was shirking and doing an end-run around the New York disciplinary rules; and (iv) to get before the First Department the fact that Justice Cooper's findings had no evidentiary merit whatsoever and that he had acted, in Defendant Supple's words, "corruptly" in the matrimonial action.

19.    Once again, after Plaintiff retained Defendant Supple, he represented to Plaintiff on several occasions that he was "thinking about" and "preparing the motion for reconsideration." However, no motion for reconsideration was ever filed.  Defendant Supple never drafted anything and completely blew the deadline for filing.  Plaintiff believes that Defendant Supple never had any intention of filing a motion for reconsideration, despite his representations to Plaintiff that he intended to do so.

8

20.     Defendant Supple's failure to prepare and file a motion for reconsideration of the September 19, 2016 Order based on the above stated issues was materially negligent and prejudicial to Plaintiff in the New York disciplinary proceeding.

VI.     <u>Motion to Stay the New York Disciplinary Matter Pending Plaintiff's Appeal of the Underlying Matrimonial Judgment</u>

21.     Once again, in Plaintiff's early conversations with Defendant Supple, he repeatedly represented to Plaintiff that it was of the utmost importance that Plaintiff seek a stay of the New York disciplinary matter pending the outcome of underlying appeal in the matrimonial case. Specifically, Defendant Supple explained to Plaintiff that the New York disciplinary proceeding was an entirely dependent matter based on the independent matrimonial matter.  By granting the collateral estoppel petition in September 2019, the First Department had effectively decided Plaintiff's appeal of the matrimonial judgment before the appeal had even been filed.  Thus, a dependent matter (the collateral estoppel disciplinary proceeding) was influencing and effectively determining the outcome of an independent matter (the matrimonial appeal).

22.     Defendant Supple stated to Plaintiff that it was important to stop the New York disciplinary proceeding in its tracks.  He explained that Ms. Hamilton had already done harm by failing to previously request a stay.  Defendant Supple stated to Plaintiff that should the New York disciplinary matter proceed in parallel with Plaintiff's appeal of the matrimonial judgment, it would cause further problems and prejudice to Plaintiff – which it did.  An example Defendant Supple provided to Plaintiff is that should a mitigation/aggravation hearing take place in the New York disciplinary proceeding, Plaintiff would be unable to provide any testimony at the hearing, such as testimony showing remorse, because it would compromise his appeal.  And, both Plaintiff and Defendant Supple had located case law that supported the proposition that the New York disciplinary proceeding should be stayed.

9

23.     For months, Defendant Supple represented to both Plaintiff and Plaintiff's father, Jeffrey Zappin, that he was working on a motion to stay the New York disciplinary proceeding pending the appeal of the underlying matrimonial action.  In reality, Defendant Supple never did any work on a motion to stay.  Instead, he allowed a mitigation/aggravation hearing to take place without any objection whatsoever and allowed the New York disciplinary proceeding to proceed in parallel with the underlying matrimonial appeal.  In fact, as discussed below, Plaintiff believes that Defendant Supple never had any intention of filing a motion to reconsideration, despite his representations to Plaintiff that he intended to do so and was merely stringing Plaintiff along.

24.     Defendant Supple's failure to prepare and file a motion to stay the New York disciplinary proceeding pending Plaintiff's appeal of the underlying matrimonial action was materially negligent and prejudicial to Plaintiff in the New York disciplinary proceeding.

VII.     Settlement Negotiations with the AGC

25.     During Plaintiff's calls with Defendant Supple prior to retaining him, he represented to Plaintiff that he was significant sway within the AGC having previously worked within the office.  Similarly, Defendant Supple represented to Plaintiff that he was attorney in the AGC that used utilized collateral estoppel and he "knew how to defeat it."  Based on these representations, Defendant Supple stated that he believed he could have settlement negotiations with the AGC whereby Plaintiff would be "given a censure" or be given a "period practicing law under the supervision of another attorney."  Defendant Supple stated that the AGC and Staff Attorney Kevin Doyle held serious animus towards Plaintiff and that he could help diffuse it.

26.     Despite these representations, Defendant Supple never once even attempted to have settlement talks with the AGC or Staff Attorney Kevin Doyle.  Indeed, Defendant Supple was completely blowing smoke to Plaintiff, which he later admitted to Plaintiff.

27.     Defendant Supple's representations on this issue was a large reason as to why Plaintiff retained him.  Defendant Supple's failure to follow through on his promises by failing to even make overtures of settlement with the AGC and Staff Attorney Kevin Doyle was completely fraudulent.  Indeed, a skillful litigator could have diffused the situation at least to the extent that it would have provided some benefit to Plaintiff.  However, Defendant Supple's failure to take any action whatsoever only further heightened tensions and reinforced the AGC and Staff Attorney Kevin Doyle's desire to crucify Plaintiff.

VIII.    The Mitigation/Aggravation Hearing

28.     Despite Defendant Supple's early warning that proceeding with a mitigation/aggravation hearing while the underlying appeal of the matrimonial judgment was pending would be disastrous, Defendant Supple did nothing to try to avert it.   In fact, he led Plaintiff to slaughter.   And, to make matters worse, his actions before and during the hearing were incredibly negligent and prejudiced Plaintiff.

a.      Defendant Supple Asked for No Discovery

29.     Prior to the mitigation/aggravation hearing, Defendant Supple failed to ask for a single document of discovery, which would have aided Plaintiff's mitigation case.  Specifically, Defendant Supple failed to ask for at least the following necessary and material discovery:

      i.     Documents that Justice Cooper had actually engaged in extrajudicial conduct by providing sealed matrimonial documents in the matrimonial action to the press;

      j.     Documents in Justice Cooper's possession related to the metadata to Ms. Comfort's purported domestic violence photographs that showed that the photographs had been digitally altered;

11

ii.      Documents that Justice Cooper and Staff Attorney Kevin Doyle had collaborated in writing the child custody decision in which the New York collateral estoppel disciplinary proceeding was based on;

iii.     Documents that Plaintiff's co-counsel in the matrimonial action David Schorr had effectively cut a deal with Staff Attorney Doyle and the AGC for a reduced sanction for misconduct in Mr. Schorr's own divorce in return for failing to provide assistance to Plaintiff in his disciplinary proceeding and for Mr. Schorr destroying evidence (*i.e.*, the metadata to Ms. Comfort's purported domestic violence photographs) that were essential to Plaintiff's mitigation case; and

iv.     Documents that Staff Attorney Doyle had extensive communications and colluded with Ms. Comfort's counsel, Robert Wallack, and the Attorney for the Child Harriet Newman Cohen in order to steer the *Zappin v. Comfort* child custody trial into a disciplinary trap for Plaintiff.

These documents not only existed, but were highly relevant and material. Despite Plaintiff's pleas to Defendant Supple, he refused to undertake any action to obtain them for the mitigations/aggravation hearing.

b.      Failure to Object to the Hearing or Explained Why Plaintiff Was Not Testifying

30.     As stated above, Plaintiff was placed in an unconstitutional conundrum with respect to the mitigation/aggravation hearing. Specifically, because the hearing was taking place while Plaintiff's appeal of the underlying matrimonial judgment was pending, Plaintiff was placed in a position where he was effectively unable to testify. This was because he highly disputed Justice Cooper's findings and anything Plaintiff testified to at the hearing would either be seen as

aggravating (*e.g.*, if he disputed Justice Cooper's findings) or would have compromised his appeal (*e.g.*, if Plaintiff showed "remorse" for conduct related to Justice Cooper's findings).

31.     In other words, the AGC and First Department placed Plaintiff in a constitutionally untenable situation.   Specifically, the pendency of the mitigation/aggravation hearing unconstitutionally interfered with Plaintiff's right to pursue his appeal of the underlying matrimonial proceeding.   To Plaintiff's great prejudice, Defendant Supple failed to raise any objection or note on the record at the mitigation/aggravation hearing the constitutional issues involved.

32.     At Defendant Supple's advice, Plaintiff did not testify at the mitigation/aggravation hearing for the reasons explained above.   Even more important, though, Defendant Supple negligently failed to explain or note on the record why Plaintiff was not testifying and that it could not be construed as a "lack of remorse."   Instead, Defendant Supple later negligently allowed the AGC to argue that Plaintiff's silence was a lack of remorse.

       c.     <u>Washington, DC Police Report</u>

33.     At the aggravation/mitigation hearing, Defendant Supple negligently allowed Staff Attorney Doyle and the AGC to read into the record a portion of a deposition transcript in which Plaintiff described filing a police report against Ms. Comfort after an episode of domestic violence she had committed against him.   At no point did Defendant Supple request that Staff Attorney Doyle or the AGC place an actual copy of the police report in the record.   Nor did Defendant Supple request that Staff Attorney Doyle or the AGC explain the relevance of the testimony or report.

34.     In subsequent post-hearing briefs, without objection, Defendant Supple allowed Staff Attorney Doyle and the AGC to assert that Plaintiff had filed a false police report against Ms.

Comfort in Washington, DC. More specifically, Staff Attorney Doyle and the AGC asserted that

Justice Cooper made findings that Ms. Comfort never abused Plaintiff so consequently the police

report must have been false. This is despite the fact that Justice Cooper made no specific findings

about Plaintiff's Washington, DC police report and that it was never placed in the report where it

could be actually read. Defendant Supple's failure to object to the AGC's underhanded conduct

was materially negligent and prejudicial to Plaintiff.

        d.    <u>Refusal to Present Evidence that Justice Cooper's Findings Were Fabricated</u>

35.    Perhaps the best mitigation evidence of all is incontrovertible evidence that Plaintiff

did not engage in the conduct attributed to him by Justice Cooper. Such evidence did exists. For

example, the following was undisputed:

      i.     Justice Cooper ascribed testimony to Plaintiff and declared that it was false.

            However, the ascribed testimony was found no where in the record;

      ii.     Justice Cooper found that Plaintiff falsified a host of text messages and

            entered them into evidence at trial. However, upon reviewing the exhibits,

            the text messages described by Justice Cooper were never entered into

            evidence by Plaintiff;

      iii.    Justice Cooper found that Plaintiff induced his expert Dr. Manion to give

            false testimony because, according to Justice Cooper, Dr. Manion testified

            that Plaintiff wrote his expert report. However, the record is clear that Dr.

            Manion never gave such testimony and, in fact, testified that he wrote his

            own expert report; and

      iv.    Undisputed photographic evidence provided by Ms. Comfort's mother

            showing that contradicted Ms. Comfort's purported domestic violence

photographs and showed her without the bruises and marks Ms. Comfort

claimed she had.

Despite this incontrovertible and uncontested evidence, Defendant Supple refused to even attempt

to introduce it into evidence at the mitigation/aggravation hearing.  This was materially negligent

and prejudicial to Plaintiff.

> e.   Objections to Staff Attorney Doyle Raising New Allegation of Attorney
> Misconduct in his Post-Hearing Briefs

36.   In Staff Attorney Doyle's post-hearing briefs, he attempted to attribute new

allegations of attorney misconduct to Plaintiff that were not raised at the mitigation/aggravation

hearing and for which Plaintiff had never been charged.  Defendant Supple failed to object to this

misconduct by Staff Attorney Doyle, which was negligent and prejudicial to Plaintiff.

> IX.   Defendant Supple Statement's Concerning Justice Cooper and the February 29,
> 2016 Child Custody Decision in *Zappin v. Comfort*

37.   During the course of the representation, Plaintiff had numerous calls with

Defendant Supple.  Likewise, Defendant Supple had numerous calls with Plaintiff's father, Jeffrey

Zappin about the matter.

38.   In these calls, Defendant Supple would repeatedly acknowledge and refer to Justice

Cooper as "corrupt" and a "teamster thug."   On several occasions while discussed the case,

Defendant Supple noted to Plaintiff and his father that "it was clear" Justice Cooper had

"fabricated" the findings in the February 26, 2016 child custody decision in *Zappin v. Comfort*.

Defendant Supple further stated at times to Plaintiff and his father that Justice Cooper had a "hard

on for Anthony" and that Justice Cooper "wrote the custody decision" and "made-up findings"

with the "intention of having Anthony disbarred."   Defendant Supple stated to Plaintiff's father on

at least one occasion that:  "It's clear from the record that Anthony did not do the things Cooper

found in the custody order.  Cooper, Kaplan, Harriet [Newman Cohen] and [Brian] Comfort wanted him disbarred, they turned the custody trial into a circus and used Cooper's decision as the vehicle to do it."

39.    Of even more important were statements made by Defendant Supple to both Plaintiff and his father on at least one occasion concerning Justice Cooper's February 26, 2016 child custody decision.  During a telephone call, Defendant Supple remarked that:  "You actually think Cooper was smart enough to write this [custody] decision?  C'mon dude."  When Plaintiff and his father inquired who would have written it then, Defendant Supple stated:  "This has [Staff Attorney Kevin] Doyle all over it.  They [Doyle and Cooper] wrote this thing together so that they could bring a collateral estoppel case against you."  When Plaintiff asked how he knew this, Defendant Supple stated:  "I still know what goes on in that office.  I hear all the scuttlebutt." Defendant Supple went on:  "You've got to remember kid, I'm the guy who write the books and the articles and gives the presentations that lets the fucks in the Grievance Committee get away with the shady shit they do.  So don't act surprised that I know what happens in that office."

40.    Accordingly, Defendant Supple apparently knew that Staff Attorney Kevin Doyle and Justice Cooper collaboratively wrote the February 29, 2016 child custody decision in *Zappin v. Comfort*.  This fact went directly to the issues of whether Plaintiff had a full and fair opportunity to be heard, whether he had a biased arbiter in the child custody trial and whether the AGC through Staff Attorney Kevin Doyle had engaged in misconduct by effectively manufacturing evidence. Yet, Defendant Supple refused to raise this issue, bring it to the attention of the First Department or even request discovery and/or documentation related to the issue.  By failing to take any action, Defendant Supple, either negligently or deliberately, prejudiced Plaintiff and seriously undermined Plaintiff's defense in the collateral estoppel disciplinary.

X.     Defendant Supple Communicating a Threat on Behalf of Cooper and Company

41.     On March 29, 2017, Plaintiff was arrested based on a bogus complaint by Justice Matthew Cooper alleging that Plaintiff had filed a false police report against him.  On a first offense misdemeanor, the New York Criminal Court ordered Plaintiff held on bond where he was sent to Riker's Island.  Plaintiff was subsequently "lost" on Riker's Island for days.  Plaintiff's parents and attorneys were told that the Riker's Island facility could not locate Plaintiff (the excuse was given that Plaintiff was going through "processing") and therefore bail could not posted. Meanwhile, Plaintiff was denied food, injected with contraindicative medication, placed in a "special" cell without running water and without a toilet and forced to sleep on the floor without a bed.  The facts are set forth more fully in Plaintiff's Complaint in *Zappin v. Cooper et al.*, 1:20-cv-02669, Dkt. No. 1, filed in this Court.

42.     Shortly after Plaintiff was released on bail, Plaintiff and his father spoke to Defendant Supple on the phone.  Defendant Supple stated that he heard what had happened.  He further stated that he was at the AGC's office on another matter a few days prior and had ran into Staff Attorney Kevin Doyle.  Defendant Supple told Plaintiff and his father that Staff Attorney Doyle was "giddy" and went out of his way to speak to Defendant Supple.  Specifically, Defendant Supple told Plaintiff that Staff Attorney Doyle said:  "We got your boy Zappin.  He's over in Riker's right now getting pounded by some big black cock.  Hopefully this teaches that little shit a lesson."

43.     Defendant Supple went on to tell Plaintiff (and his father) that he need to just give up, accept the discipline in New York and stop filing lawsuit.  He further stated that Plaintiff had really "agitated" not only Cooper and Kaplan, but "a lot of the higher-ups" in the court system with his lawsuits and other attempts to bring their corruption to light.  Defendant Supple stated

that: "This arrest was a warning.  If you keep suing them, putting up websites, making videos or whatever, they're going to arrest you again.  Next time, they'll gin something up on your much worse and you won't have a $2,500 bail, you'll have a $250,000 bail.  Take your warning and get the fuck out of New York."

44.     It was at this point it became clear to Plaintiff that Defendant Supple was no longer working for him or his best interests in the disciplinary matter.

XI.     Defendant Supple's Fraud

45.     As discussed above, Defendant Supple made numerous representations to Plaintiff (and his father) concerning actions that he intended to take in the collateral estoppel disciplinary proceeding in Plaintiff's defense.  This included representations concerning the filing on a motion to clarify, a motion for reconsideration and a motion to stay.  Similarly, in the Summer of 2017, Defendant Supple made numerous representation that he intended to prepare, was preparing and intended to file a federal Section 1983 suit on Plaintiff's behalf to attempt to enjoin the collateral estoppel disciplinary proceeding.

46.     As set forth above, Defendant Supple failed to make good on any of these representations.  Plaintiff believes, however, that Defendant Supple never had any intention of making good on these representations when they were made to Plaintiff.  Instead, Defendant Supple's actual motivation in making the statements was to pacify Plaintiff and string him along.

47.     Upon information and belief, Defendant Supple strung Plaintiff along and made these repeated knowingly false representations to Plaintiff for two reasons:  (i) Defendant Supple did not want to take any action in Plaintiff's collateral estoppel disciplinary matter that would weaken the AGC's to use collateral estoppel as a disciplinary tool; and (ii) Defendant Supple did not want to take any action that would embarrass, undermine or otherwise bring light to the

corruption of the AGC or members of the New York judiciary.  In fact, Plaintiff believes that it is possible that Defendant Supple was either threatened or received a *quid pro quo* to undermine Plaintiff's defense of the collateral estoppel disciplinary matter.

48.     Regardless, Defendant Supple made numerous material representations to Plaintiff that he relied on in the course of defending the collateral estoppel disciplinary proceeding.  Yet, it is apparent that Defendant Supple knew these representations were false and were not going to be carried out when he made the representations.   Consequently, Plaintiff was defrauded by Defendant Supple.

XII.   <u>Defendant Supple's Withdrawal</u>

49.     On July 21, 2017, Defendant Doyle improperly withdrew from the matter.   Prior to the withdrawal, Defendant Supple had assured Plaintiff that he was working on preparing a federal lawsuit seeking an injunction against the New York disciplinary proceeding since it was apparent it was brought in bad faith.  For months, Defendant Supple strung Plaintiff along.

50.     However, when Plaintiff began to push for the filing after he was subjected to a retaliatory arrest by Justice Cooper where Staff Attorney Doyle and the AGC played a significant role in instigating, Defendant Supple withdrew by letter to the AGC and Referee Martin Gold.

51.     His withdrawal was improper because he failed to first file a motion in the First Department seeking permission to withdrawal.  Indeed, he did not want to do so in an apparent attempt to protect his friends at the AGC.  So, instead, he improperly withdrew by letter without proper notice to Plaintiff.

52.     Defendant Supple's abrupt and improper withdrawal was materially negligent and highly prejudicial to Plaintiff as both Ms. Hamilton and Defendant Supple had effectively exhausted all of Plaintiff funds.  There was no question that Defendant Supple was aware of

Plaintiff's financial situation and that he would be unable to hire new counsel.  And, to make matters worse, nearly all of Defendant Supple's failures discussed above were exploited by the AGC and First Department in subsequent briefing and orders, despite Plaintiff trying to correct them *pro se*.

## COUNT 1: NEGLIGENCE/LEGAL MALPRACTICE
### (All Defendants)

53.    Plaintiff re-alleges and incorporates by reference paragraph 1 – 52 of this Complaint as though fully set forth herein.

54.    As legal counsel for Plaintiff, Defendants owed Plaintiff duties of professional care, loyalty, diligence and skill.

55.    By engaging in the conduct set forth above, Defendants failed to exercise ordinary reasonable care and diligence used under the same or similar circumstances by attorneys and thereby breached those duties of professional care owed to Plaintiff.

56.    As a direct and proximate result of Defendants' negligence and failure to exercise reasonable diligence and care in their representation of Plaintiff, Plaintiff has suffered injury and damages with respect to his West Virginia law license.  These damages include, but are not limited to, attorneys' fees, lost wages and damage to his reputation.  The total amount of Plaintiff's injuries and damages should be determined at trial.

## COUNT 2: BREACH OF CONTRACT
### (All Defendants)

57.    Plaintiff re-alleges and incorporates by reference paragraph 1 – 56 of this Complaint as though fully set forth herein.

58.    Through the conduct alleged in this Complaint, Defendants materially breaches their express and implied contractual obligations to Plaintiff that it would take all action legally

necessary and appropriate to protect Plaintiff's interests in the collateral estoppel disciplinary action; that it would perform all legal services with due care and diligence; and that it would provide Plaintiff with professional, skilled and careful lawyers to handle the proceeding.

59.     Moreover, Defendants breached each of the terms forth in Paragraph 58, where such terms were material to the agreement that Plaintiff would allow Defendants to continue to represent him in the collateral estoppel disciplinary proceeding.

## COUNT 3: FRAUD
### (All Defendants)

60.     Plaintiff re-alleges and incorporates by reference paragraph 1 – 59 of this Complaint as though fully set forth herein.

61.     As set forth above, Defendants made numerous material representations to Plaintiff during the course of their representation of him in the New York collateral estoppel disciplinary proceeding.

62.     Defendants knew that these representations were not true or that the acts Defendants represented they would take would not be undertaken.

63.     Plaintiff reasonably relied on Defendants' representations and, to his detriment, continued to retain Defendants based on these representations.

64.     Plaintiff suffered damages as a result of Defendant's tortious and fraudulent actions.  Plaintiff seeks damages in an amount to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

(a)     Enter judgment in favor of Plaintiff against Defendant

(b)     Enter judgment award Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendants' activities complained of herein and for any injury complained of herein, inclusive of interests and costs, in an amounted to be determined at trial;

(c)     Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)     Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)     Order such other relief that the Court deems just and appropriate.


Dated: August 24, 2020
       Huntington, WV

_____
ANTHONY ZAPPIN
1827 Washington Blvd.
Huntington, WV 25701
(304) 730-4463 (tel.)
anthony.zappin@gmail.com
*Plaintiff, Pro Se*

22